1    MORGAN, LEWIS & BOCKIUS LLP
     COLLIE F. JAMES, IV, (SBN 192318)
2    cjames@morganlewis.com
     5 Park Plaza, Suite 1750
3    Irvine, CA 92614
     Tel.: 949/399-7000
4    Fax: 949/399-7001

5    CHRISTINA L. SEIN, (SBN 229094)
     csein@morganlewis.com
6    MONIQUE E. CHO, (SBN 251949)
     mcho@morganlewis.com
7    300 South Grand Avenue
     Twenty-Second Floor
8    Los Angeles, CA 90071-3132
     Tel: 213/612-2500
9    Fax: 213/612-2501

10   Attorneys for Defendants
     PNEUMO ABEX CORPORATION (nka Pneumo
11   Abex LLC) and WHITMAN CORPORATION
     (nka Pepsi-Cola Metropolitan Bottling Company, Inc.)

12

13                 UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15

16   DONNA M. AVILA, et al.,                  Case No. C-99-3941 SI

17              Plaintiffs,                    (Consolidated with Case Nos. C-01-0266 SI
                                               and C-06-2555 SI)
18        vs.
                                               **DEFENDANTS PNEUMO ABEX
19   WILLITS ENVIRONMENTAL                     CORPORATION AND WHITMAN
     REMEDIATION TRUST, et al.,                CORPORATION'S NOTICE OF
20                                             MOTION AND MOTION TO
                Defendants.                    EXCLUDE IN PART THE EXPERT
21                                             TESTIMONY OF DR. VERA BYERS
                                               AND DR. ROD O'CONNOR AND
22                                             MOTION FOR SUMMARY
                                               JUDGMENT; MEMORANDUM IN
23                                             SUPPORT THEREOF**

24                                             (Honorable Susan Illston)

25                                             Date:   February 1, 2013
                                               Time:  9:00 a.m.
26                                             Dept.: Courtroom 10

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

                                        CASE NO. C-99-3941 SI
                        DEFENDANTS' MOTION TO EXCLUDE
                           AND MOTION FOR SUMMARY
                                          JUDGMENT

**NOTICE OF MOTION**

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on February 1, 2013, at 9:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 10 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California, Defendants Pneumo Abex Corporation and Whitman Corporation (collectively, "Defendants") will and hereby do move this Court for the following: (1) to strike in part the expert opinions of Plaintiffs' experts Dr. Vera Byers and Dr. Rod O'Connor on exposure, causation and medical monitoring; and (2) for summary judgment in Defendants' favor on all claims asserted by Plaintiffs Audrey Southwick, Chase Southwick and Angelique Titus.  This motion is brought on the grounds that Plaintiffs' experts Dr. Byers and Dr. O'Connor have failed to meet the requirements of Federal Rule of Evidence 702, and Plaintiffs have failed to provide evidence establishing a material element of their claims.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of Collie F. James, IV, and all exhibits thereto, the pleadings and papers on file herein, and any other matters that may be presented to the Court at the time of the hearing.

**RELIEF REQUESTED**

Defendants respectfully request that the Court strike in part the expert opinions of Dr. Vera Byers and Dr. O'Connor, and grant summary judgment in Defendants' favor on all of the claims asserted by Plaintiffs Audrey Southwick, Chase Southwick and Angelique Titus.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

1

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   Dated: November 16, 2012                    MORGAN, LEWIS & BOCKIUS LLP
                                                Collie F. James, IV
2                                               Christina L. Sein
                                                Monique E. Cho
3

4
                                          By   ___/s/ Collie F. James, IV_____
5                                               Collie F. James, IV
                                                Attorneys for Defendants
6                                               PNEUMO ABEX CORPORATION (nka
                                                Pneumo Abex LLC) and WHITMAN
7                                               CORPORATION (nka Pepsi-Cola
                                                Metropolitan Bottling Company, Inc.)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

2

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................... 1

II.    STATEMENT OF ISSUES ...................................................... 3

III.   STATEMENT OF FACTS ....................................................... 3

    A.   Factual Background ...................................................... 3

    B.   Procedural History ....................................................... 4

    C.   Plaintiffs' Claims And Expert Testimony Offered In Support Thereof ................ 5

        1.   Plaintiff Audrey Southwick ................................... 5

        2.   Plaintiff Chase Southwick .................................... 5

        3.   Plaintiff Angelique Titus ...................................... 6

        4.   Plaintiffs' Expert Testimony ................................. 6

IV.    ARGUMENT .......................................................................... 7

    A.   Summary Judgment Standard ....................................... 7

    B.   Plaintiffs Must Prove Exposure And Causation Through Reliable Expert Testimony ................ 7

    C.   Expert Testimony Must Have A Factual And Scientific Foundation ..................... 8

    D.   Plaintiffs' Exposure Expert Is Wholly Unqualified And Advances An Exposure Theory At Odds With Accepted Scientific Methodology And The Factual Record ................ 9

        1.   Dr. O'Connor's Chrome VI Exposure Theories Are Inadmissible ............ 9

        2.   Plaintiffs' TCE Exposure Theory Is Invalid and Should Be Excluded ................ 13

        3.   Dr. O'Connor's Unsubstantiated Dose Calculations Are Grossly Overstated ................ 15

    E.   Plaintiffs' Causation Theories Are Scientifically And Factually Invalid And Should be Excluded Outright ................ 16

        1.   Plaintiff Audrey Southwick ................................... 16

        2.   Plaintiff Chase Southwick .................................... 18

        3.   Plaintiff Angelique Titus ...................................... 20

    F.   Plaintiffs Cannot Satisfy The Potter Factors For Medical Monitoring ................ 21

        1.   Plaintiffs Fail to Provide Evidence of Significant or Extensive Exposure ................ 22

        2.   Chrome VI and TCE Are Only Toxic at High, Occupational Levels ....... 22

        3.   Dr. Byers' Opinion that Plaintiffs Are at a Quantifiable Increased Risk of Contracting Disease Is Unfounded ................ 22

        4.   Plaintiffs Have No Admissible Evidence that They Are at Risk of Developing Serious Disease ................ 23

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

1

## **TABLE OF CONTENTS**

2

**Page**

3

     5.     Plaintiffs Have Not Demonstrated Any Clinical Value to Early

4
             Detection and Diagnosis or Provided a Specific Medical
             Monitoring Plan ........................................................................................ 24

5
V.     CONCLUSION ..................................................................................................... 25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Addisu v. Fred Meyer, Inc.,
   198 F.3d 1130 (9th Cir. 2000)..................................................................................... 7

Allen v. Pa. Eng'g Corp.,
   102 F.3d 194 (5th Cir. 1996)..................................................................................... 16

Arlich, et al. v. Willits Environmental Remediation Trust,
   Case No. C-01-0266 SI ............................................................................................. 4

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ................................................................................................... 7

Daubert v. Merrell Dow Pharm., Inc.,
   43 F.3d 1311 (9th Cir. 1995)................................................................................... 25

Daubert v. Merrell Dow Pharm., Inc.,
   509 U.S. 579 (1993) ............................................................................................ 8, 23

Espinosa v. Little Co. of Mary Hosp.,
   31 Cal. App. 4th 1304 (1995).................................................................................... 8

Ferris v. Gatke Corp.,
   107 Cal. App. 4th 1211 (2003).................................................................................. 8

Gen. Elec. Co. v. Joiner,
   522 U.S. 136 (1997) ................................................................................................... 9

Golden v. CH2M Hill Hanford Grp., Inc.,
   528 F.3d 681 (9th Cir. 2008)..................................................................................... 8

Gordon v. Havasu Palms, Inc.,
   93 Cal. App. 4th 244 (2001)...................................................................................... 8

In re Baycol Prods. Litig.,
   218 F.R.D. 197 (D. Minn. 2003).............................................................................. 25

In re Marine Asbestos Cases,
   265 F.3d 861 (9th Cir. 2001)................................................................................... 24

Jackson v. E. Bay Hosp.,
   980 F. Supp. 1341 (N.D. Cal. 1997) ......................................................................... 7

Jones v. Ortho Pharm. Corp.,
   163 Cal. App. 3d 396 (1985)............................................................................... 8, 17

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

iii

DB2/ 23655309.5

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................... 8

*Lockheed Martin Corp. v. Super. Ct.*,
    29 Cal. 4th 1096 (2003) .............................................................................. 24

*Nickerman, et al. v. Remco Hydraulics, Inc.,*,
    Case No. C-06-2555 SI. ................................................................................ 4

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000).................................................................... 7

*O'Connor v. Boeing N. Am.*,
    No. CV-97-1554, 2003 WL 25691035 (C.D. Cal. Nov. 3, 2003)............................... 24

*Potter v. Firestone Tire & Rubber Co.*, \
    6 Cal. 4th 965 (1993) ..................................................... 2, 21, 22, 25

*Sutera v. Perrier Grp. of Am., Inc.*,
    986 F. Supp. 655 (D. Mass. 1997) .................................................. 15

*Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir. 1996)............................... 20

**STATUTES**

Fed. R. Civ. P.
    56........................................................................................................ 7

Fed. R. Evid.
    702................................................................................................. 3
    702(b)-(d) ..................................................................................... 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.**     **INTRODUCTION**

3       After a series of dismissals and settlements, only three plaintiffs remain in this action:

4  Audrey Southwick, Chase Southwick and Angelique Titus (collectively, "Plaintiffs"). Plaintiffs'

5  claims nevertheless suffer from the same fatal deficiencies previously (and repeatedly) identified

6  by this Court and affirmed by the Ninth Circuit. Namely, as before, Plaintiffs fail to provide

7  reliable expert evidence establishing (1) exposure to toxicologically significant levels of the

8  substances at issue, and (2) that these exposures are capable of causing, and actually did cause,

9  Plaintiffs' injuries.

10      In a nutshell, Plaintiffs claim that they were exposed to hexavalent chromium ("chrome

11  VI") and tricholorethylene ("TCE") via inhalation during periodic visits to one location in Willits,

12  Luna's Market, located adjacent to the Remco site. Although Plaintiffs have made some attempt

13  to more narrowly tailor their claims, they continue to disregard the factual record and offer expert

14  opinions untethered to reality and applicable science. Accordingly, Defendants Pneumo Abex

15  Corporation and Whitman Corporation (collectively, "Defendants") are entitled to judgment as a

16  matter of law on Plaintiffs' claims for the following reasons:

17      ***First***, Plaintiffs fail to provide reliable evidence demonstrating that they were exposed to

18  toxicologically significant amounts of chrome VI and TCE. As in the *Whitlock* case, Plaintiffs

19  once again look to Dr. Rod O'Connor, a chemist with no air modeling or medical experience, to

20  craft a theory demonstrating that the exposures experienced at Luna's Market were dangerously

21  high and exceeded known regulatory and health standards to the degree that one can credibly

22  conclude their injuries were caused by those exposures. Having learned that his attempts in

23  *Whitlock* to manufacture inflated exposure scenarios using the 2004 Public Health Assessment

24  ("PHA") for chrome VI and the 2006 PHA for Trichloroethane ("TCA") as a proxy for TCE

25  failed to meet requisite evidentiary standards, Dr. O'Connor now rejects the PHAs outright as

26  unreliable, along with all accepted and modern procedures for air modeling, in favor of his own,

27  ludicrously-constructed basement experiments and simple mathematical equations. In short, he

28  now claims that the circular shape of the innermost ring of the PHA air modeling establishes that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

1

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   diffusion of Remco contaminants were unaffected by weather patterns and, thus, by simple

2   reference to equations regarding cylinder volumes, he can confirm that the PHA's air most

3   aggressive air concentration estimates – which were not included in the final findings of the

4   ATSDR – are reasonable.  In other words, Dr. O'Connor helpfully concludes that the unreliable

5   PHA confirms that the PHA's most extreme estimates are, in fact, reliable.  Suffice it to say, Dr.

6   O'Connor's new theory lacks all factual and scientific credibility and fails to meet minimum

7   evidentiary standards, rendering it inadmissible as a matter of law.

8        ***Second***, even if Plaintiffs' exposure theories were minimally reliable (which they are not),

9   Plaintiffs fail to provide reliable evidence demonstrating that the exposures were the cause of or a

10   substantial factor in the development of their alleged injuries.  Indeed, Plaintiffs' causation

11   expert, Dr. Vera Byers, repeatedly claims they have injuries that are not actually identified in the

12   medical records, fails to provide proof the Remco contaminants are even capable of causing the

13   injuries claimed, and either neglects to identify an exposure threshold associated with the injuries

14   or uses thresholds applicable to irrelevant and different types of ailments.  Even more, Dr. Byers

15   utterly fails to credibly and meaningfully examine and rule out other, plainly obvious likely

16   causes of Plaintiffs' ailments, as required.  As just one example, Dr. Byers claims Mr.

17   Southwick's gastritis – which is not actually diagnosed in his medical records – was caused by

18   chrome VI even though he drank a large amount of boric acid as a child, which incident prompted

19   his stomach ailments.  Such failure to abide by minimal legal and scientific standards compels the

20   exclusion of Dr. Byers' opinions.

21        ***Third***, Plaintiffs' medical monitoring claims fare no better because Plaintiffs wholly fail

22   to meet the five-factor test set forth in *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965

23   (1993).  At best, Plaintiffs demonstrate *de minimis* exposure, which is far from the "significant"

24   exposure required by *Potter*.  Moreover, Plaintiffs do not provide the requisite support for their

25   assertion that they have an increased risk of developing a serious disease.  Instead, Dr. Byers

26   simply proclaims it to be true, substantiating her entire medical monitoring opinion on the simple

27   statement that Plaintiffs' exposures give them "an elevated risk of cancer and non cancer

28   disorders associated with [chrome VI and TCE]."  Declaration of Collie F. James, IV ("James

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

2

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   Decl."), Exhs. 15, 16, 17 at 3 (Byers Reports).  Plaintiffs' experts also fail to propose a tailored

2   medical monitoring plan, as required.

3           For these reasons, which are discussed in full below, Plaintiffs' expert testimony should

4   be excluded as unreliable and inadmissible, and Plaintiffs' claims should be dismissed with

5   prejudice for lack of necessary evidentiary support.

6   **II.**     **STATEMENT OF ISSUES**

7           (1) Whether the expert opinions of Dr. Vera Byers and Dr. Rod O'Connor on exposure,

8   causation and medical monitoring should be stricken in part for failure to meet the requirements

9   of Federal Rule of Evidence 702.  (2) Whether summary judgment is appropriate on Plaintiffs'

10  claims because Plaintiffs have failed to provide evidence, through competent expert testimony, of

11  exposure, causation and the *Potter* factors for medical monitoring, which are material elements of

12  these claims.

13  **III.**    **STATEMENT OF FACTS**

14          **A.**     **Factual Background**

15          Chromium is a naturally occurring element found in rocks, animals, plants and soil.

16  James Decl., Exh. 1 at 2 (Chromium ATSDR).  Chromium is present in the environment in

17  several different forms, with two of the most common being trivalent chromium (chrome III) and

18  chrome VI.  *Id.*  Trivalent chromium is naturally occurring and an essential nutrient for humans.

19  *Id.* at 2, 9.  Chrome VI is primarily created by industrial processes.  *Id.* at 9, 347.

20          Defendants' involvement with Remco began with the acquisition of the facility by a

21  corporate predecessor on August 21, 1968, and ended on December 16, 1988, when another

22  predecessor company sold the facility to MC Industries, Inc., a company with no links to

23  Defendants.  James Decl., Exhs. 2 at WHIT0251133, 3 at WHIT0070057.

24          Beginning in 1963, chrome VI was used at Remco in the chrome plating process with the

25  installation of two small chrome plating pits.  James Decl., Exhs. 4 at 83:8-13 (11/16/10

26  O'Connor Dep.), 5 at WHIT0250918, 6 at DHS0031172 (Budish Dep. at 18:12-18).  The type of

27  chromium electroplating performed at the facility was called "hard chrome plating."  In this

28  process, a base metal and another substance made of a lead alloy are immersed in a tank of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

3

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1  chromic acid solution.  An electric current is passed through this solution, causing the chrome VI

2  to adhere to a base metal.  James Decl., Exh. 7 at 26:4-28:12 (Kenfield Dep.).  There are no

3  emissions from a chrome tank unless plating is occurring.  *See, e.g.,* James Decl., Exh. 8 at

4  AQMD0010935.  Additional tanks were added beginning in 1968.

5        Throughout its operation, Remco made improvements and modifications to the facility

6  both to promote worker safety and to reduce any emissions into the outdoor environment.

7  Corporate records indicate that from 1968 to 1974, Remco employed a foam blanket product

8  called Foam-Lok, poly balls and several foam blanket additives to further reduce emissions.

9  *Compare* James Decl., Exh. 9 at 2 (PHA) *with* Exh. 10 at DHS0022453-2454 (Wake Dep. at

10  269:11-19) *and* Exh. 11 at DHS0031231 (Figg-Hoblyn Dep. at 27:3-11).  On or before April 15,

11  1974, a new "scrubber" system was installed at the Remco facility.  James Decl., Exhs. 12 at

12  MCI0201558, 1713, 13 at WHIT0021659; *see also* Exh. 9 at 2 (PHA).  The system was

13  extremely effective, and, even according to the PHA, controlled emissions with 83% efficacy.  *Id.*

14  at 2 (PHA).  Accordingly, since at least April 1974, emissions of chrome VI into the outdoor air

15  were reduced to *de minimis* levels.

16        The other chemical at issue in this litigation, TCE, is a colorless liquid that was used as a

17  solvent to clean metal parts.  James Decl., Exh. 14 at 4 (*Whitlock* O'Connor Report).  In 1975, the

18  facility ceased using TCE and switched to another degreasing solvent, 1, 1, 1 – trichloroethane

19  ("TCA").  James Decl., Exh. 20 at 14 (O'Connor Report).

20       **B.**    **Procedural History**

21        This action commenced on August 23, 1999.  (Complaint, Docket No. 1).  On February

22  13, 2002, the Court consolidated this action with the subsequently-filed action *Arlich, et al. v.*

23  *Willits Environmental Remediation Trust*, Case No. C-01-0266 SI ("Arlich Action").  (Order,

24  Docket No. 215).  On June 5, 2008, the Court consolidated this action with a second

25  subsequently-filed action, captioned *Nickerman, et al. v. Remco Hydraulics, Inc., et al.*, Case No.

26  C-06-2555 SI.  (Order, Docket No. 1077).  During the pendency of this action, a group of thirty

27  plaintiffs initiated a separate action captioned *Whitlock, et al. v. PepsiAmericas, et al.*, Case No.

28  C-08-2742 SI (Complaint, Docket No. 1).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

4

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    The Plaintiffs at issue are the final three of a group of approximately 78 plaintiffs whose

2    claims were revived following the reversal by the Ninth Circuit of a prior statute of limitations

3    issue or were later added to the action by stipulation.  Two plaintiffs voluntarily abandoned their

4    claims, and Defendants filed an earlier Motion for Summary Judgment in July 2012 with respect

5    to the claims of 23 plaintiffs for whom Plaintiffs' experts failed to render causation opinions or

6    suffered from other fundamental defects.  (Motion for Summary Judgment, Docket No. 1386).

7    Thirteen of those plaintiffs voluntarily dismissed their claims, which the Court subsequently

8    finalized.  (Order, Docket No. 1397).  On October 9, 2012, the Court granted summary judgment

9    on an additional six of the 23 plaintiffs.  (Order, Docket No. 1399).  While such motion was

10   pending, the parties engaged in two weeks of mediation on all remaining claims in August and

11   September 2012.  James Decl., ¶ 33.  During such mediations, 53 plaintiffs agreed to resolve their

12   claims and entered into written settlement agreements.  *Id.*

13       Only three plaintiffs refused to settle their claims: Audrey Southwick, Chase Southwick

14   and Angelique Titus.  After further attempts to resolve their claims were unsuccessful, this

15   motion became necessary.

16   **C.**    **Plaintiffs' Claims And Expert Testimony Offered In Support Thereof**

17           1.    Plaintiff Audrey Southwick

18       Ms. Southwick, born April 28, 1937, claims that her pneumonia and gastritis were caused

19   by chrome VI and her multiple miscarriages and systemic lupus erythematosus (SLE) were

20   caused by exposures to TCE.  James Decl., Exh. 15 at 1-3 (Byers Report).  She also seeks an

21   award for medical monitoring.  *Id.*  Ms. Southwick has resided in Willits from 1942 to the

22   present.  *Id.* at 1.

23           2.    Plaintiff Chase Southwick

24       Mr. Southwick, born October 21, 1970, was hospitalized as a young child after drinking a

25   large amount of boric acid and has a history of "frank alcoholism and binge drinking."  James

26   Decl., Exh. 16 at 1, 3 (Byers Report).  Nevertheless, he attributes his otitis media, pneumonia and

27   gastritis to exposures to chrome VI and TCE.  *Id.* at 3.  He also seeks an award for medical

28   monitoring.  *Id.*  Mr. Southwick has resided in Willits from 1970 to the present.  *Id.* at 1.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

5

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

### 3. Plaintiff Angelique Titus

Ms. Titus was born on November 7, 1977, but did not move to Willits until 1980. James Decl., Exh. 17 at 1 (Byers Report). She claims that her "symptom complex" (consisting of severe and frequent ENT infections, otitis media and bronchitis) was caused by exposures to chrome VI and TCE. *Id.* at 2-3 (Byers Report). In addition, she seeks damages for medical monitoring. *Id.* Ms. Titus alleges that she was exposed during certain periods from 1980 – 1993 and 1998 – present. *Id.* at 1.

### 4. Plaintiffs' Expert Testimony

Plaintiffs seek to establish exposure and causation through two experts.[1] Dr. Rod O'Connor is a chemist who, despite having no significant experience in air dispersion modeling, attempts to opine on the historical exposure concentrations of chrome VI and TCE to which Plaintiffs were allegedly exposed at Luna's Market. Although he admits that the 2004 Public Health Assessment ("PHA") conducted by the Agency for Toxic Substances & Disease Registry ("ATSDR") is unreliable, he nevertheless founds his entire theory on the PHA's most extreme estimates. He also presents calculations which he claims are plaintiff-specific cumulative exposure levels and compares these figures to inapplicable regulatory standards and risk percentages to determine if those exposure levels were capable of causing injury.

Dr. Byers is a physician specializing in immunology. Dr. Byers does not offer actual causation opinions in this action. Rather, she limits herself to purportedly confirming the existence of the claims injuries in Plaintiffs' medical records and stating that Dr. O'Connor's exposure calculations confirm that chrome VI and TCE were "substantial factors" in causing Plaintiffs' alleged injuries. She also makes a cursory attempt at discussing possible alternative causes and includes the rote notation that Plaintiffs are at an "elevated risk of cancer and non cancer disorders" in an attempt to justify an award of medical monitoring.

Simply put, the opinions of Plaintiffs' experts fail to meet minimum standards of

---

[1] Plaintiffs have one additional expert, Dr. Linda Remy, who performed a statistical analysis, at the population level, wherein she attempted to determine if people living in Willits had more hospital discharges than people living elsewhere. Dr. Remy does not, however, offer any opinions specific to Plaintiffs or their injuries. *See* James Decl., Exh. 21 (Remy Report). As such, Dr. Remy's report and opinions cannot alone substantiate Plaintiffs' claims.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

6

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   reliability and should be excluded as a matter of law.

2   **IV.   ARGUMENT**

3       **A.   Summary Judgment Standard**

4           Summary judgment is proper when materials in the record, including depositions,

5   affidavits, declarations, or admissions, show that there is no genuine dispute as to any material

6   fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;

7   *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Accordingly, the moving party

8   is entitled to summary judgment when it produces "either evidence negating an essential element

9   of the nonmoving party's claim or defense or show[s] that the nonmoving party does not have

10  enough evidence of an essential element."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210

11  F.3d 1099, 1102 (9th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

12  ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and

13  upon motion, against a party who fails to make a showing sufficient to establish the existence of

14  an element essential to that party's case . . .").  When the nonmoving party fails to make a

15  showing sufficient to establish the existence of an essential element, "there can be 'no genuine

16  issue as to any material fact,' since a complete failure of proof concerning an essential element of

17  the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23.

18          Here, Defendants are entitled to judgment as a matter of law on Plaintiffs' claims because

19  Plaintiffs have insufficient evidence to support exposure, causation and the *Potter* factors for

20  medical monitoring, which are all essential elements of their claims.

21      **B.   Plaintiffs Must Prove Exposure And Causation Through Reliable Expert
             Testimony**
22

23          In order to demonstrate a genuine issue of material fact, Plaintiffs must provide admissible

24  evidence to establish exposure and causation.  Specifically, under California law[2], a plaintiff

25  claiming personal injury from exposure to hazardous substances must prove to "a reasonable

26  medical probability based upon *competent expert testimony*" that such exposure was the cause, or

27
28  ---
    [2] Plaintiffs' claims are governed by California law.  "When a federal court has supplemental jurisdiction over a
    plaintiff's state claims, state substantive law governs the merits of that claim."  *Jackson v. E. Bay Hosp.*, 980 F. Supp.
    1341, 1351 (N.D. Cal. 1997).

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

7

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   a substantial factor in the cause, of the injury.  *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d

2   396, 402 (1985) (emphasis added); *see also Gordon v. Havasu Palms, Inc.*, 93 Cal. App. 4th 244,

3   252 (2001).  Accordingly, Plaintiffs must first produce competent and admissible evidence that

4   they were actually exposed to the substances at issue because "[i]f there has been no exposure,

5   there is no causation."  *Ferris v. Gatke Corp.*, 107 Cal. App. 4th 1211, 1220 n.4 (2003).  If

6   Plaintiffs are able to establish exposure, they must then demonstrate that the substances are

7   capable of causing the injuries alleged (general causation) *and* that the substances actually

8   caused, or were a substantial factor in causing, their injuries (specific causation).  *See Golden v.*

9   *CH2M Hill Hanford Grp., Inc.*, 528 F.3d 681, 683 (9th Cir. 2008).  In order to satisfy their

10  burden, Plaintiffs must show that any exposure was "more than a slight trivial, negligible, or

11  theoretical factor."  *Espinosa v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304, 1313-14 (1995)

12  (citation omitted).

13          **C.**       **Expert Testimony Must Have A Factual And Scientific Foundation**

14          Expert testimony on the issues of exposure and causation is not sufficient in and of itself

15  to overcome summary judgment.  Expert testimony is admissible only if it meets certain minimal

16  standards of reliability, and must also have a factual and scientific foundation.  To that end,

17  Federal Rule of Evidence 702 provides that expert testimony is admissible if: (1) it is "based on

18  *sufficient facts or data*"; (2) it is "the product of *reliable principles and methods*"; and (3) "the

19  expert has *reliably applied the principles and methods* to the facts of the case."  Fed. R. Evid.

20  702(b)-(d) (emphasis added).

21          *Daubert* assigns a gate-keeping role to the trial court and mandates that expert testimony

22  be excluded if the reasoning or methodology underlying that testimony is invalid or irrelevant.

23  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999).  Experts do not possess a *carte*

24  *blanche* to express any opinion within an area of expertise.  *See Daubert v. Merrell Dow Pharm.,*

25  *Inc.*, 509 U.S. 579, 589 (1993) ("Rule 702 . . . clearly contemplates some degree of regulation of

26  the subjects and theories about which an expert may testify.").  To the contrary, an expert's

27  testimony must "rest[] on a reliable foundation," and must be "more than subjective belief or

28  unsupported speculation."  *See id.* at 589-90, 597.  Indeed, "nothing in either *Daubert* or the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

8

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    Federal Rules of Evidence requires a district court to admit opinion evidence which is connected

2    to existing data only by the *ipse dixit* of the expert."  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

3    146 (1997).

       **D.      Plaintiffs' Exposure Expert Is Wholly Unqualified And Advances An
4               Exposure Theory At Odds With Accepted Scientific Methodology And The**
5               **Factual Record**

6               1.      Dr. O'Connor's Chrome VI Exposure Theories Are Inadmissible

7           Over the course of this decade-long litigation, Plaintiffs have repeatedly struggled to come

8    up with some evidence comporting both with the factual record and accepted scientific principles

9    establishing that the levels of chrome VI emitted into the air in Willits during the operative time

10   periods were high enough to cause the injuries alleged.  These range from straight adherence to

11   the PHA to an attempt to multiply such exposures by reference to estimated "periodic peak"

12   levels.  Every attempt to date has been thoroughly rejected by the Court and, where appealed,

13   such rejection has been upheld.

14          Plaintiffs go once more into the breach with Dr. Rod O'Connor, the very same expert

15   whose periodic peak exposure theory was found lacking in *Whitlock*.  Recognizing that something

16   dramatic had to be done, Dr. O'Connor confirms what Defendants have been maintaining all

17   along:  the PHA is fatally flawed and cannot be credibly relied upon to determine what levels of

18   chrome VI existed at any location in Willits during the applicable time period.[3]  *See* James Decl.,

19   Exh. 19, at 60:9-13 (O'Connor Dep.).

20          Amazingly, however, Dr. O'Connor now concludes that average chrome VI concentration

21   levels in the area are in fact much higher than the models that the ATSDR chose to publish in the

22   PHA.  Even more amazingly, Dr. O'Connor flatly contradicts himself by turning right around and

23   basing his entire opinion on a passing statement in the PHA regarding the author's personal

24

25   ---
     [3] Defendants maintain that the air modeling done by the California Department of Health Services in the PHA is
26   substantively flawed because they repeatedly input incorrect data into the computer model.  For example, the PHA
     models emissions for chrome plating tanks for years when such tanks were not present.  The PHA also assumes no
     emissions controls during a number of years for which historical records and testimony show such equipment was
27   operating.  The PHA also unrealistically assumes that each tank operated at full electrical capacity 16 hours per day,
     five days per week, 52 weeks per year.  James Decl., Exhs. 25, at 1-5 to 1-6 (Suder Report); 21, at 8-12 (Altmayer
28   Report).  Defendants' reference to the PHA air modeling results is for summary judgment purposes only and does not
     indicate any acknowledgment that the PHA emission estimates are accurate or admissible.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

9

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   beliefs as to what levels might have been.  *See* James Decl., Exh. 19, at 26:4-19 (O'Connor Dep.).

2   In other words, after claiming that the PHA was unreliable, Dr. O'Connor uses it as the

3   foundation of his entire opinion.

4         Specifically, after having relied upon them in his *Whitlock* report, Dr. O'Connor now

5   rejects the actual PHA estimates of chrome VI air concentrations (including a high of 10 $\mu g/m^3$

6   from 1968-1975 and 0.2 $\mu g/m^3$ from 1976-1989) as unreliable.  Instead, he latches on to a

7   statement in the text of the PHA that concentration levels in the community adjacent to the

8   Remco facility "could have been" as high as 50 $\mu g/m^3$ in the 1968-1975 era and "could be as

9   high" 20 $\mu g/m^3$ in the 1976-1989 era.  James Decl., Exh. 9, at 15-16 (PHA).  These extremes were

10  not made part of the actual published estimates, are never characterized as the most likely

11  scenario (within a document designed to be a worst-case scenario), and nothing indicates that

12  Luna's Market was located in the so-called adjacent community where these levels "could have

13  been."  *See id.* at 15-16, Appendix D[4].

14        Even so, Dr. O'Connor clings to these extremes and, in the same breath in which he

15  proclaims the PHA flawed and unreliable, attempts to confirm that they are the actual and most

16  likely air concentration levels at Luna's Market. His work amounts to this:  because the zone

17  closest to the facility depicted in the PHA is more or less circular, one must assume that

18  meteorological conditions had no bearing on diffusion within the 100 meter radius depicted in

19  that innermost isopleth.  James Decl., Exh. 19, at 29:18-22 (O'Connor Dep.).  From there, Dr.

20  O'Connor proclaims, you can use a simple equation regarding the area of a cylinder and the

21  average concentration depicted in the PHA to extrapolate the average concentration at Luna's

22  Market.  Running the math through his calculator, Dr. O'Connor proclaims that his calculations

23  are roughly consistent with the PHA statement discussed above and, based thereon, concludes

24  that, more probably than not, Plaintiffs experienced average concentrations of 50 $\mu g/m^3$ while

25  visiting Luna's Market from 1968-1975 and 20 $\mu g/m^3$ from 1976-1989.  He then purports to

26  calculate Plaintiffs' doses using these figures and self-reported Plaintiff testimony regarding when

27

28

---

[4] Appendix D to the PHA is the Dispersion Modeling Report upon which the PHA relies, however, there is no modeling whatsoever of the hypothetical 50 µg/m3 concentration level in the 1968-1975 era and the 20 µg/m3 in the 1976-1989 era.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

they visited Luna's Market.  Finally, Dr. O'Connor compares these numbers to various regulatory limits and a study showing the levels at which workers were shown to experience mucosal irritation (a condition not claimed by any Plaintiff here) before concluding that the exposures were "more likely than not" "at levels and times sufficient to result in the types of adverse health effects associated with chromium (VI) and/or trichloroethylene."  James Decl., Exh. 20, at 18 (O'Connor Report).

Dr. O'Connor's chrome VI theories are invalid at every level.  First, Dr. O'Connor is simply unqualified to perform the analysis and modeling required in this case.  Dr. O'Connor is a chemist.  He is not an air modeler and, indeed, readily admits that he is not an expert in air modeling, "particularly in these – in these relatively new, highly sophisticated computer models." James Decl., Exh. 19, at 49:19-24 (O'Connor Dep.).  The only time he has ever used a computer in connection with air modeling was 20 years ago when one of his "graduate students at Baylor showed [him] how to run that particular model." *Id.* at 50:2-16.  He had no idea what model program was used by the ATSDR and had never even heard of the program (ISCST3) when it was told to him at deposition. *Id.* at 50:18-51:7.  Unfortunately, such computer models are generally accepted in the industry as the proper method to model the dispersion of contaminants in the air.  Even more, Dr. O'Connor provides no independent support for the novel and simplistic methodology he employs.  In such context, it becomes clear that Dr. O'Connor is patently unqualified to critique the PHA or air modeling methodology generally nor is he qualified to pronounce that his methodology – used nowhere else in the relevant field – is more accurate than the sophisticated computer models employed by practitioners in the field.  This alone dooms his entire exposure theory.

Setting aside Dr. O'Connor's lack of qualifications, Dr. O'Connor's simplistic methodology is laughably flawed.  At his deposition, Dr. O'Connor referred repeatedly to the dispersion of chromium close to the Remco facility as being "diffusion controlled," meaning that instead of being dispersed into the atmosphere as a result of prevailing wind conditions, the chrome VI emissions simply floated away from the source points in a uniform fashion as if in a closed and windowless room.  James Decl., Exh. 19, at 30:9-18, 61:22-62:8, 69:20-22, 70:3-20,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

11

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

73:13-74:5,75:5-8, 76:4-8 (O'Connor Dep.). Dr. O'Connor's foundational premise stems

exclusively from his observation that the innermost isopleth as depicted in the PHA is round,

which he claims establishes that wind and other meteorological conditions at the site had no effect

on the diffusion of chromium in that 100 meter radius area. *Id.* at 29:18-22. He further claims

that meteorological records at the Ukiah airport, located over 20 miles away from Willits in a

different valley, confirms his assumption that the air was completely still within a 100 meter

radius of the Remco site most of the time.

All of Dr. O'Connor's foundational assumptions are indisputably wrong. Although Dr.

O'Connor claims that ATSDR must have modeled the "red zone" according to his diffusion

theory because it is the only "reasonable" conclusion, he admits that he has no information at all

whether that is true. James Decl., Exh. 19, at 71:9-15 (O'Connor Dep.). In fact, the ATSDR did

not model it that way, and the circular shape of the isopleths is simply an artifact of the

procedures used to represent the modeled concentration contours in the mapping figures included

in the PHA, not as a result of any atmospheric conditions unique to the area, as speculated by Dr.

O'Connor. If the data is more closely refined, the isopleth is not round at all, not unlike an image

that appears to have soft contours when viewed through an unfocused camera lens but reveals

sharp edges and irregular shape when brought into focus. James Decl., Exh. 25, at 3-17 to 3-23;

5-3 to 5-4; Appendix A, Figure A-8 (Suder Report). Of course, Dr. O'Connor was not even able

to access the data and was completely unfamiliar with the calculations performed by the ATSDR

computer model, so he was completely ignorant of such fact and has made no attempt to refute it.

James Decl., Exh. 19, at 58:23-59:3; 86:1-20; 185:9-186:2 (O'Connor Dep.). Furthermore, Dr.

O'Connor inexplicably chose to use airport data from Ukiah instead of freely-available Remco-

site data. Indeed, Dr. O'Connor admitted that he was not even able to open the Remco site data

on his computer so he simply chose to ignore it.[5] *Id.* at 58:23-59:3. Nevertheless, given that the

---

[5] Dr. O'Connor attempts to justify his use of the Ukiah airport data over site-specific data on the basis that the Ukiah data covers at least a portion of the relevant operating history whereas the Willits-specific data is more recent. James Decl., Exh. 19, at 63:24-64:6 (O'Connor Dep.). Indeed, Dr. O'Connor remarkably claims that one can never create a reliable air model for a prior era unless one has meteorological data for the specific prior period. *Id.* at 65:3-7. Of course, Dr. O'Connor can present no support for this statement beyond his own say so. *Id.* at 65:9-20. Even more, he makes his pronouncement even as he admits that ATSDR and other qualified air modelers – including many he

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

12

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1  actual data reveals the diffusion was not uniform and the wind conditions in Willits were not

2  predominately calm, the only reasonable conclusion is that Dr. O'Connor's diffusion theory is

3  utter speculation founded upon demonstrably untrue factual assumptions.  On this basis alone,

4  Dr. O'Connor's entire theory falls apart.

5          Dr. O'Connor's rudimentary cylinder equation is also fatally flawed.  In addition to

6  discarding any accepted methodology for air modeling, Dr. O'Connor's process wrongly assumes

7  that there was only one release point (the center of his arbitrarily drawn circle) and fails to place

8  that assumed release point at a location where chrome plating was performed or, at least, in the

9  middle of the chrome plating area.  Indeed, in order to generate the highest values, Dr. O'Connor

10  simply placed the release point at the point on the facility closest to Luna's Market.  James Decl.,

11  Exh. 29 (Exh. 16 to O'Connor Dep.).  In truth, the adjacent room was part of the front offices of

12  the Remco facility, a sizeable distance from the plating area.  Once these invalid assumptions are

13  exposed, it becomes obvious that Dr. O'Connor's conclusions are unreliable and inadmissible as a

14  matter of law.

15          2.     Plaintiffs' TCE Exposure Theory Is Invalid and Should Be Excluded

16          Dr. O'Connor's TCE exposure theory, like his chrome VI exposure theory, is premised on

17  nothing more than mere speculation and conjecture.  As Plaintiffs acknowledge, the Remco

18  facility ceased using TCE in 1975, replacing it with TCA.  James Decl., Exh. 20 at 5 (O'Connor

19  Report).  In Dr. O'Connor's own words, "the only quantifiable numbers that I have [for TCE]

20  were prior to 1975."  James Decl., Exh. 19 at 29:5-6 (O'Connor Dep.).  Thus, Plaintiffs' TCE

21  exposure claims only encompass the inhalation of emissions from Remco at Luna's Market from

22  1963 through 1975.[6]

---

23  has worked with – "do that all the time."  *Id.* at 65:19-24.  Such candid admissions only further demonstrate Dr.

24  O'Connor's utter lack of qualification for the work required in this action.

[6] Plaintiffs' experts make passing reference to the potential for residual environmental TCE exposures after 1975, but

25  make no attempt to quantify such exposures or link them to any claimed injuries.  Indeed, Dr. O'Connor's cumulative

exposure chart for TCE (Table 5) excludes all exposures after 1975 as being "significant."  James Decl., Exh. 20 at

26  14-15, Table 5 (O'Connor Report); Exh. 19 at 255:15-256:3 (O'Connor Dep.).  Likewise, although Dr. Byers

identifies "contamination of groundwater" as a basis for significant exposure post-1975, she concedes that neither she

27  nor Dr. O'Connor, on whose opinion she relies exclusively, was able to quantify that exposure.  James Decl., Exh. 22

at 86:13-87:23 (Byers Dep.).  Moreover, when asked whether Plaintiffs were exposed to toxicologically significant

28  levels of TCE in the creeks after the facility stopped using it in 1975 or 1976, Dr. Byers responded, "I don't think

so."  *Id.* at 85:23-86:1.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

13

1    In *Whitlock*, Dr. O'Connor attempted to manufacture estimated TCE levels at Luna's

2    Market from 1965 – 1975 by reference to a 2006 PHA that estimated levels in the late 1980s and

3    early 1990s at sites adjacent to the facility for an entirely different chemical, TCA.  James Decl.,

4    Exh. 23 at 5 (*Whitlock* Order).  Dr. O'Connor sought to use the TCA levels modeled in that report

5    as a proxy for TCE levels in the 1960s and 1970s.  This Court soundly rejected that methodology

6    on a number of grounds and also found, in any event, that even the highest off-site levels assumed

7    by Plaintiffs' experts were orders of magnitude below levels associated with human health

8    effects.  *Id.* at 7-9.

9    Now, Dr. O'Connor has abandoned his prior TCA theory in favor of a novel theory that

10   makes no attempt to do any actual air modeling or to draw from actual usage and procedures at

11   the facility during the operative time period.  Instead, Dr. O'Connor simply picks a TCE air

12   concentration value out of thin air – 1,200 μg/m3 – which he then claims would have resulted in

13   an average air concentration level of 600 μg/m3 at Luna's Market given that, according to him,

14   the wind blew in the opposite direction 50% of the time.  James Decl., Exh. 20 at 10 (O'Connor

15   Report).  Dr. O'Connor then purports to confirm this reasonableness of this made-up value by

16   reference to the same, invalid uniform diffusion theory that he employs for chrome VI and a

17   rudimentary TCE evaporation experiment that he conducted in 1999.  *Id.* at 9-10.  Specifically –

18   and remarkably – Dr. O'Connor refers to an experiment he conducted in which he measured the

19   evaporation rate of TCE in a bucket into a closed room, and then extrapolates backwards from his

20   made-up air concentration level to determine the amount of TCE that would have to be spilled in

21   order to result in air concentrations of that magnitude.  Without any qualification or outside

22   support – and in complete disavowal of accepted air modeling methodology – Dr. O'Connor

23   claims that his closed-room experiment is the best and most proper way to determine how TCE

24   would have dissipated from the machine areas inside the facility into the outdoor air and migrated

25   to Luna's Market.  Using the same simple cylinder equation he employed in his chrome VI work,

26   Dr. O'Connor asserts that this method effectively confirms his earlier work in *Whitlock*, and

27   validates his assumption that short-term maximum concentrations of TCE at Luna's Market

28   during the 1963 -1975 time period were "more than 600 μg/m$^3$." *Id.* at 10.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

14

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    Once again, Dr. O'Connor's rudimentary work is patently speculative and unsupportable.

2   Setting aside the fact that he is completely unqualified to conduct this analysis and his air

3   concentration levels are a complete fiction, Dr. O'Connor fails to explain how his assumed

4   average TCE concentration in his current report is *more than twice as high* as any concentration

5   modeled by ATSDR for TCA in 1988 at any offsite location, even though he previously testified

6   that the differences in chemical properties between TCE and TCE would have resulted in lower

7   TCE levels.  James Decl., Exhs. 24 at 12 (TCA PHA), 19 at 128:14-24 (11/16/10 O'Connor

8   Dep.).  In fact, the TCA air modeling (which is instructive, albeit imperfect) flatly contradicts Dr.

9   O'Connor's analysis.  Based on actual testing conducted at the site and using accepted air

10   modeling techniques, the ATSDR estimated that at high extremes, the highest measured off-site

11   levels did not exceed 225 $\mu g/m^3$, nowhere near the 600 $\mu g/m^3$ average he now claims exists, or the

12   unbelievable 7,680 $\mu g/m^3$ figure that Dr. O'Connor proposed at his deposition.  James Decl.,

13   Exhs. 25 at 2-2 (Suder Report), 19 at 304:5-9 (O'Connor Dep.).  Again, however, Dr. O'Connor

14   fails to provide any explanation as to why the ATSDR air modeling is invalid or why his indoor

15   evaporation test – used nowhere else by any air modeling expert – is the proper method for the

16   issues presented here.  For all of these reasons, Dr. O'Connor's TCE exposure theory is should be

17   stricken.

18        3.    Dr. O'Connor's Unsubstantiated Dose Calculations Are Grossly Overstated

19    As set forth above, Dr. O'Connor's air concentration calculations for chrome VI and TCE

20   are vastly overstated and patently defective due to his use of faulty factual assumptions and

21   reliance on a methodology of his own creation that controverts every generally-accepted practice

22   and methodology in the air modeling field.  As such, his cumulative dose calculations for

23   Plaintiffs are equally defective and unreliable.  Dr. O'Connor also improperly attempts to

24   characterize his TCE dose calculations as establishing dangerous levels of exposure capable of

25   causing injury simply by reference to occupational regulatory standards set by the EPA.  James

26   Decl., Exh. 20 at 11-12, 15 (O'Connor Report).  Such regulatory standards have little, if any,

27   value here because they are based on conservative assumptions used to drive regulatory policy.

28   *See Sutera v. Perrier Grp. of Am., Inc.*, 986 F. Supp. 655, 664 (D. Mass. 1997) ("[A] regulatory

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

15

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1  standard, rather than being a measure of causation, is a public-health exposure level that an

2  agency determines pursuant to statutory standards set by [a governmental body].").  Significantly,

3  these levels are "lower than that appropriate in tort law, which 'traditionally makes more

4  particularized inquiries into cause and effect' and requires a plaintiff to prove 'that it is more

5  likely than not that another individual has caused him or her harm.'"  *Allen v. Pa. Eng'g Corp.*,

6  102 F.3d 194, 198 (5th Cir. 1996) (citation omitted).  Because Dr. O'Connor's dose calculations

7  rely on faulty assumptions and improper comparisons to regulatory standards, they are invalid

8  and should be rejected.

9      **E.**    **Plaintiffs' Causation Theories Are Scientifically And Factually Invalid And**

10             **Should be Excluded Outright**

11          1.    Plaintiff Audrey Southwick

12        Dr. Byers claims that Ms. Southwick's pneumonia and gastritis were caused by chrome VI

13  and that her systemic lupus erythematosus (SLE) and multiple miscarriages were caused by TCE.

14  Dr. Byers' opinions lack all scientific and factual merit.  First, Dr. Byers relies entirely on Dr.

15  O'Connor's flawed opinions for all exposure and dose information.  James Decl., Exh. 22 at

16  26:13-15 (Byers Dep.).  As demonstrated above, such theories are fatally flawed and must be

17  excluded.  In the absence of admissible evidence of exposure to toxicologically significant levels

18  of chrome VI and/or TCE, Dr. Byers' opinions are likewise unsupportable.

19        Second, even if Dr. O'Connor's exposure theories were admissible, Dr. Byers' opinions

20  are devoid of factual and scientific support.  For example, Dr. Byers concludes that Ms.

21  Southwick has SLE as a result of TCE exposure.  As an initial matter, Ms. Southwick has not

22  been diagnosed with SLE; rather, her medical records indicate that she has rheumatoid arthritis.

23  James Decl., Exh. 26 at 281, 286 (Guzelian Report).  Moreover, Dr. Byers provided no scientific

24  evidence of a causation threshold for SLE and, consequently, no evidence that Ms. Southwick's

25  alleged exposure exceeded any such threshold, as required.  James Decl., Exh. 22, at 196:17-22

26  (Byers Dep.).  Finally, Dr. Byers makes no attempt to explain how TCE caused Ms. Southwick's

27  conditions when her symptoms first presented in 1992, *17 years after* TCE use ceased at Remco,

28  or to otherwise provide independent scientific evidence that such a latency period is consistent

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

16

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   with TCE-caused SLE.  Any one of these shortcomings is alone fatal, but when seen in

2   conjunction, they reveal the total invalidity of Dr. Byers' opinions.

3            Dr. Byers' discussion of Ms. Southwick's miscarriages fares no better.  Indeed, Dr. Byers

4   offers no meaningful discussion of Ms. Southwick's miscarriages at all and, furthermore, admits

5   that she does not have any information about the levels of chrome VI or TCE that can cause

6   miscarriages in humans.  James Decl., Exh. 15 at 2 (Byers Report), 22 at 22:12-15 (Byers Dep.).

7   Dr. Byers fails to establish that Ms. Southwick – who was born in 1937 – suffered all of her

8   miscarriages during the period Remco used TCE.  In fact, no medical records regarding Ms.

9   Southwick's miscarriages were submitted for review, and, thus, Dr. Byers issued her opinion

10  without the benefit of any documentary proof.  Furthermore, Ms. Southwick had two children

11  born in 1967 and 1970 – the same period Plaintiffs claim she was experiencing high levels of

12  TCE – which strongly undermines her claim of miscarriage/fertility problems due to exposure.

13  James Decl., Exh. 27 at 5 (2001 Audrey Southwick Questionnaire).  Nevertheless, Dr. Byers

14  simply ignores this inconvenient fact.  As such, Dr. Byers' opinions on Ms. Southwick's

15  miscarriages are pure speculation and must be excluded.

16           Additional fatal defects are present in Dr. Byers' gastritis and pneumonia opinions, which

17  she attributes to chrome VI.  As an initial matter, Ms. Southwick's medical records do not show a

18  diagnosis of gastritis, only "intestinal metaplasia."  James Decl., Exh. 26 at 281 (Guzelian

19  Report).  In any event, Ms. Southwick's gastric ailments did not appear until 2006, *43 years after*

20  her alleged first exposure and 11 years after the Remco facility closed.  *Id*. at 283.  Similarly, her

21  episodes of pneumonia did not begin until 1990, *37 years after* her alleged first exposure to

22  Remco and two years after the Remco facility was sold.  James Decl., Exh. 15 at 1 (Byers

23  Report).  Again, Dr. Byers leaves all of these obvious issues unaddressed.

24           Finally, even if Plaintiffs' experts were able to show exposure and general causation, they

25  must also demonstrate that Ms. Southwick's exposure to Remco emissions, rather than something

26  else, was more likely than not the cause of her injuries.  *See Jones*, 163 Cal. App. 3d at 403.  Dr.

27  Byers, however, fails to meaningfully analyze and rule out possible alternative causes for Ms.

28  Southwick's alleged injuries.  For example, Ms. Southwick suffered from aspiration pneumonia

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

17

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   that was due to gastroesophageal reflux disease (GERD).  *See* James Decl., Exh. 15 at 1 (Byers

2   Report).  She also has increased risk factors for gastritis, such as older age, excessive alcohol use,

3   and stress, but these are all simply disregarded.  As mentioned above, Dr. Byers did not have

4   medical records for Ms. Southwick's miscarriages and, thus, could not even consider alternative

5   causes.

6              2.        Plaintiff Chase Southwick

7              Mr. Southwick, who was born in 1970, suffers from severe alcoholism, at one point,

8   drinking two liters of vodka per day, has spent significant periods of his life in prison, and is a

9   frequent visitor to the emergency room for accidents and other injuries.  James Decl., Exh. 16 at

10  1-3 (Byers Report).  He claims that exposure to chrome VI caused his otitis media and gastritis

11  and that both chrome VI and TCE caused his pneumonia.  *Id.* at 3.  Mr. Southwick's claims must

12  fail because they are premised exclusively on expert opinions that fail to meet minimum legal and

13  scientific standards.

14             Dr. Byers admits that she relied exclusively on Dr. O'Connor for all exposure and dose

15  information.  James Decl., Exh. 22 at 26:13-15 (Byers Dep.).  Because Dr. O'Connor's opinions

16  are entirely unreliable, Dr. Byers' conclusions must also fail.  Even if Dr. O'Connor's opinions

17  were admissible, Dr. Byers' conclusions nevertheless are fatally flawed.  Dr. Byers' gastritis

18  opinion is particularly egregious.  As she admits, nearly every incidence of stomach distress

19  experienced by Mr. Southwick was associated with a different documented and known cause:  in

20  1974, he ingested a large amount of boric acid; in 1978, his gastritis was determined to be viral in

21  nature; in 1982, his upset stomach was associated with stress at home and was in any event later

22  diagnosed as simple constipation; in 1992, he ingested a Pepsi that he said had something in it;

23  and in 2002 and thereafter, his frequent vomiting was caused by his "descen[t] into frank

24  alcoholism."  James Decl., Exh. 16 at 1-3 (Byers Report).  In this context, it is inconceivable how

25  Dr. Byers could have concluded that Mr. Southwick's alleged periodic (15-20 minutes a day, a

26  few days a week) visits to Luna's Market caused his stomach ailments, and not these other causes

27  specifically identified in his medical records.  Nevertheless, Dr. Byers does exactly that,

28  dismissing them out of hand without even trying to explain her conclusions.  Even worse, she

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

18

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    states that his "gastritis predates his abuse histories" and that his "history shows no significant

2    exposure to [other] toxic chemicals" even though her report patently indicates the opposite.  *Id.*

3    at 3.  The law and prudent science requires a more reasoned and supportable explanation to

4    uphold an admissible expert opinion on causation. As such, Dr. Byers' gastritis opinion must be

5    excluded as unsupportable.

6         Dr. Byers' otitis media and pneumonia conclusions fare no better.  First, Dr. Byers fails to

7    provide any independent scientific proof that otitis media, *i.e.,* ear infections, are even caused by

8    chrome VI.  The only supporting study she cites (Gibb *et al.* 2000b) simply refers to mucosal

9    irritation and perforated ear drums.  In fact, the ATSDR Toxicological Profile on chrome VI fails

10   to even mention otitis media or ear infections among the injuries known to be associated with

11   chrome VI exposure.  As such, Dr. Byers has failed to establish general causation, as required.

12        Further, instead of providing specific scientific evidence establishing the levels at which

13   exposure to chrome VI and TCE are associated with pneumonia and otitis media, Dr. Byers

14   inexplicably relies on a single study which identified the level at which chromium-exposed

15   workers developed mucosal irritation and then summarily proclaims that this level is the

16   applicable threshold for any number of other health conditions, including otitis media and

17   pneumonia.  *See* James Decl., Exh. 22 at 161:13-17; 166:19-167:5 (Byers Dep.); Exh. 20 at 13

18   (O'Connor Report).  Dr. Byers provides no independent support whatsoever for the notion that a

19   threshold associated with irritated nasal passages can be used as a proxy threshold for other,

20   unrelated injuries, nor does she provide any independent scientific evidence that the presence of

21   mucosal irritation always leads to otitis media and/or pneumonia, as would be required to allow

22   such machinations.

23        Dr. Byers also admits that she did not have specific cumulative dose threshold information

24   for any injury at issue related to TCE. James Decl., Exh. 22 at 172:8-13 (Byers Dep.).  Nearly all

25   of Mr. Southwick's incidences of these conditions, in any event, occurred after the facility

26   stopped using TCE.  Moreover, the study she cites to show an association between immune

27   system effects among workers (Dr. Byers claims the TCE-induced immune suppression permits

28   pneumonia to develop) and TCE indicates a threshold exposure level of 35,000 μg/m3 (+/-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

19

1  14,000), which is orders of magnitude lower than even the inflated levels hypothesized by Dr.

2  O'Connor, on whom she exclusively relies. *Id.* at 189:21-192:7. This is fatal to Mr. Southwick's

3  TCE-based injury claims. *See Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir. 1996)

4  ("[T]he expert should offer an opinion as to whether the dose to which the plaintiff was exposed

5  is sufficient to cause the disease.").

6  3.   <u>Plaintiff Angelique Titus</u>

7      Ms. Titus was born in 1977 but did not move to Willits until 1980, several years after a

8  highly-efficient scrubber was installed at Remco and five years after the facility ceased using

9  TCE. James Decl., Exh. 17 at 1 (Byers Report); Exh. 9 at 2 (PHA); Exh. 20 at 5 (O'Connor

10  Report). Nevertheless, Dr. Byers concludes that her "symptom complex" (severe and frequent

11  ENT infections, otitis media and bronchitis) was caused by a combination of exposure to chrome

12  VI and "immune dysregulation induced by TCE." James Decl., Exh. 17 at 3 (Byers Report). Dr.

13  Byers' conclusions are unsupportable.

14      First, Ms. Titus' exposures were *de minimis* at best. Even based on the PHA, the average

15  concentration of chrome VI during the time that Ms. Titus resided in Willits was, at most, 0.2

16  $\mu g/m^3$, far below any level associated with her claimed injuries. James Decl., Exh. 9 at Appendix

17  B (PHA). Furthermore, even relying on Dr. O'Connor's own exaggerated estimates, Ms. Titus'

18  cumulative chrome VI exposure level is significantly below the *Gibb* level associated with an

19  irritated nasal septum that Dr. Byers improperly uses as a proxy threshold level for all of Ms.

20  Titus' claimed ailments. James Decl., Exh. 20 at 13, 17 (O'Connor Report).

21      Dr. Byers' attempt to attribute Ms. Titus' injuries to TCE-induced "immune

22  dysregulation" are even more egregious. Ms. Titus did not move to Willits until five years after

23  the facility stopped using TCE, and Plaintiffs make no attempt whatsoever to explain how Ms.

24  Titus could have been exposed to any measurable level of TCE. Tellingly, Dr. O'Connor does

25  not include Ms. Titus among the list of plaintiffs with a "high risk of TCE-related diseases as a

26  result of exposure to TCE vapors at the Luna Market area." James Decl., Exh. 17 at 3 (Byers

27  Report); Exh. 20 at 14-15 (O'Connor Report). Dr. O'Connor admits that for those plaintiffs not

28  included among that list, he does not "have any numbers whatsoever for their inhalation

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

20

DB2/ 23655309.5

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    exposure."  James Decl., Exh. 19 at 293:16-25 (O'Connor Dep.).

2           Finally, even if Plaintiffs' experts were able to establish exposure and general causation,

3    Dr. Byers failed to properly consider and rule out alternative causes of Ms. Titus' alleged injuries.

4    Dr. Byers admits that she only had access to Ms. Titus' medical records starting in 1983 when she

5    was six years old, which makes it impossible for Dr. Byers to rule out that Ms. Titus' respiratory

6    problems arose due to other unrelated causes prior to her move to Willits in 1980, as required.

7    *See* James Decl., Exh. 17 at 1, 2 (Byers Report).  Moreover, Ms. Titus is morbidly obese and, as

8    Dr. Byers openly concedes, "her obesity cannot be ignored in considering her health problems."

9    *Id.* at 2.  Nevertheless, she does exactly that, failing to provide any explanation as to why Remco

10   contaminants and not her obesity are the cause of her continuing health problems decades after

11   exposures ceased.

12           **F.**     **Plaintiffs Cannot Satisfy The *Potter* Factors For Medical Monitoring**

13           Although Plaintiffs' alleged exposures to TCE and chrome VI ended at least 24 years ago,

14   Plaintiffs seek medical monitoring damages for potential future serious injuries that may be

15   connected with these alleged exposures.  "[A] claim for medical monitoring seeks to recover the

16   cost of future periodic medical examination intended to facilitate early detection and treatment of

17   disease caused by a plaintiff's exposure to toxic substances."  *Potter*, 6 Cal. 4th at 1006.  Such

18   damages are "not available solely upon proof of an exposure to toxic chemicals."  *Id.*  Rather, the

19   cost of medical monitoring is only a compensable item of damages "where the proofs

20   demonstrate, *through reliable medical expert testimony*, that the need for future monitoring *is a*

21   *reasonably certain consequence of the plaintiff's toxic exposure and that the recommended*

22   *monitoring is reasonable*."  *Id.* at 1009 (emphasis added).

23           *Potter*, the seminal California case addressing medical monitoring, requires a

24   consideration of the following factors to assess "the reasonableness and necessity of monitoring";

25   (1) the significance and extent of the plaintiff's exposures to chemicals; (2) the toxicity of the

26   chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a

27   result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had

28   he or she not been exposed, and (b) the chances of the members of the public at large of

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Irvine

DB2/ 23655309.5

21

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1   developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5)

2   the clinical value of early detection and diagnosis. *Id.* at 1009. These five factors impose

3   "substantial evidentiary burdens" on plaintiffs alleging exposure. *Id.* Moreover, toxic exposure

4   plaintiffs may only recover medical monitoring damages if the evidence establishes the necessity

5   "for specific monitoring beyond that which an individual should pursue as a matter of good sense

6   and foresight." *Id.* (citation omitted). This high standard is necessary given that medical

7   monitoring, by definition, requires a defendant to pay a plaintiff simply based on the possibility of

8   future injury in the absence of any current symptoms or other indicators that harm could result.

9       Here, Plaintiffs fail to satisfy the *Potter* factors through competent expert testimony.

10          1.    <u>Plaintiffs Fail to Provide Evidence of Significant or Extensive Exposure.</u>

11      It is axiomatic that any claim for medical monitoring must be supported by competent

12  expert evidence of exposure to levels of chemicals associated with serious human health effects.

13  For the reasons discussed above, however, Plaintiffs fail to demonstrate that their environmental

14  exposures were anything other than *de minimis*, short-lived and, at best, periodic. *See supra*

15  Section IV.E.1-3. Thus, Plaintiffs fall far short of establishing the "significant and extensive

16  exposure" required by the first *Potter* factor.

17          2.    <u>Chrome VI and TCE Are Only Toxic at High, Occupational Levels</u>

18      As discussed in the specific causation section above, Plaintiffs have failed to present any

19  admissible evidence that chrome VI or TCE is toxic at the episodic, environmental exposure

20  levels estimated by credible sources. Plaintiffs, therefore, fail to meet the second *Potter* factor.

21          3.    <u>Dr. Byers' Opinion that Plaintiffs Are at a Quantifiable Increased Risk of</u>

22                  <u>Contracting Disease Is Unfounded</u>

23      *Potter* requires a plaintiff to show *more* than an "increased but unquantified risk resulting

    from exposure to toxic chemicals." *Potter*, 6 Cal. 4th at 1009. Dr. Byers, however, does not even

24  attempt to quantify Plaintiffs' increased risk, which is insufficient as a matter of law. Indeed, the

25  sum total of Dr. Byers' justification for medical monitoring is the rote statement that Plaintiffs are

26  at an "elevated risk of cancer and non cancer disorders". James Decl., Exhs. 15, 16, 17 at 3

27  (Byers Reports). Moreover, contrary to the principles set forth in *Daubert*, Dr. Byers does not

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

22

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

provide any reliable substantiation or scientifically-viable explanation as to how she derived the alleged increased (but unquantified) risk. *See Daubert*, 509 U.S. at 589-90 ("The subject of an expert's testimony must be 'scientific . . . knowledge,'" which "connotes more than subjective belief or unsupported speculation."). When asked whether there was a level in excess of the regulatory risk ratios for cancer and non-cancer risks that Plaintiffs had to exceed in order for Dr. Byers to conclude that they were at the level of increased risk required to warrant medical monitoring, Dr. Byers simply responded as follows:

> A: I don't think so. O'Connor's opinion is that the risk of cancer was significantly elevated for anybody who was present at Willits before 1989.
> Q: Okay. And that's what you used as a basis for your conclusion here that a plaintiff -- to the extent you said it had an elevated risk of cancer and noncancer disorders?
> A: That's correct.

James Decl., Exh. 22 at 255:3-15 (Byers Dep.). Other than Dr. O'Connor's opinion, which is irreparably flawed for the reasons discussed above, Dr. Byers does not identify *any* independent basis for her conclusion that Plaintiffs are at an increased *and* quantifiable risk of illness. Thus, it is clear that her opinion is nothing more than unsubstantiated speculation. Plaintiffs, therefore, cannot satisfy the third *Potter* factor.

####    4.    Plaintiffs Have No Admissible Evidence that They Are at Risk of Developing Serious Disease

Dr. Byers contends that Plaintiffs are at risk for developing "cancer and non cancer disorders associated with these chemicals." James Decl., Exhs. 15, 16, 17 at 3 (Byers Report). Plaintiffs cannot, however, establish that they are at any risk for developing a serious disease in the future. In addition to the myriad exposure issues discussed above, Dr. Byers' speculative theory is undone by the factor of latency. Significantly, Ms. Southwick was allegedly first exposed to Remco emissions nearly *fifty* years ago and is now 75 years old. James Decl., Exh. 15 at 1 (Byers Report). Mr. Southwick was allegedly first exposed over *forty* years ago. James Decl., Exh. 16 at 1 (Byers Report). While, as Dr. Byers admits, the latency period for lung cancer due to chrome VI exposure is between twenty and thirty-five years, James Decl., Exh. 22 at 128:13-24 (Byers Dep.), neither Ms. Southwick nor Mr. Southwick has developed lung cancer, or any other cancer associated with chrome VI or TCE, nor any related symptoms. Accordingly,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

23

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

there is no basis to conclude that Plaintiffs are at risk of developing any "cancer and non cancer disorders" in the future as a result of past Remco exposures, and Plaintiffs provide no specific evidence to the contrary.  Plaintiffs, therefore, fail to satisfy the fourth *Potter* factor.

### 5. Plaintiffs Have Not Demonstrated Any Clinical Value to Early Detection and Diagnosis or Provided a Specific Medical Monitoring Plan

Plaintiffs do not even attempt to satisfy the fifth *Potter* factor.  Dr. Byers makes no effort to indicate the diseases to be screed for, the tests to be employed, or the available treatments for these conditions.  The clinical value of early detection and diagnosis varies "significantly depending on the medical condition at issue and the individual characteristics of each [person]." *Lockheed Martin Corp. v. Super. Ct.*, 29 Cal. 4th 1096, 1115 (2003).  Dr. Byers, however, proposes only a nonspecific medical monitoring plan generally applicable to all Plaintiffs.  James Decl., Exh. 28 (Exh. 3 to Byers Dep.).  A proper medical care program should be tailored to the needs of each Plaintiff, and take into account such individual factors as age, gender, medical and psychological history, and various lifestyle and familial risk factors.  *See Lockheed Martin*, 29 Cal. 4th at 1115 (observing that "individualized inquiries" are necessary to "establish the extent of additional medical monitoring required").  Dr. Byers provides no such analysis.

Moreover, Dr. Byers has not demonstrated—as required—that the outcome for each disease will be improved if a medical monitoring program is implemented.  *See In re Marine Asbestos Cases*, 265 F.3d 861, 867 (9th Cir. 2001) ("[U]nless a treatment is available that would be more beneficial to the plaintiff if administered before the illness becomes obvious, then there is no cause of action because medical monitoring cannot fulfill its purpose.") (quoting *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 980 (Utah 1993)); *O'Connor v. Boeing N. Am.*, No. CV-97-1554, 2003 WL 25691035, at *8 (C.D. Cal. Nov. 3, 2003) (granting summary judgment in part because plaintiffs had "not set forth evidence that they would benefit from early detection of [cancer] or any other disease through medical monitoring in which they would otherwise not engage").  Rather, Dr. Byers merely concludes—without citing to any scientific support or even addressing the different conditions individually—that the conditions she identifies "are more responsive to treatment if they are diagnosed early" and that "contemporary medical science []

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

24

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT

1    has shown the value of early intervention to optimize prognosis."  James Decl., Exh. 28 at 4 (Exh.

2    3 to Byers Dep.).  While Dr. Byers apparently assumes that the clinical value of early detection is

3    obvious, this is not the case because she fails to: (1) explain precisely how she went about

4    reaching her conclusions; and (2) identify some objective source that shows she has followed the

5    recognized scientific method.  *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318-19

6    (9th Cir. 1995) (noting that if an expert's testimony is neither based on pre-litigation research nor

7    subject to peer review, then the expert must explain precisely how he went about reaching his

8    conclusions and point to some objective source to show that he has followed the scientific

9    method).

10        Finally, Plaintiffs must clearly establish "the necessity, as a direct consequence of the

11   exposure in issue, for specific monitoring *beyond that* which an individual should pursue as a

12   matter of general good sense and foresight."  *See In re Baycol Prods. Litig.*, 218 F.R.D. 197, 211

13   (D. Minn. 2003); *Potter*, 6 Cal. 4th at 1009 (citations omitted).  "[T]here can be no recovery for

14   preventative medical care and checkups to which members of the public at large should prudently

15   submit."  *Id.*  Dr. Byers, however, does not address beyond vague generalizations whether the

16   medical monitoring plan she proposes goes beyond what Plaintiffs should or would pursue

17   otherwise.  James Decl., Exh. 28 at 1 (Exh. 3 to Byers Dep.).

18   **V.    CONCLUSION**

19        For the foregoing reasons, Defendants respectfully request that the Court: (1) strike in part

20   the expert opinions of Plaintiffs' experts Dr. Vera Byers and Dr. Rod O'Connor on exposure,

21   causation and medical monitoring; and (2) grant summary judgment in Defendants' favor on all

22   claims brought by Plaintiffs Audrey Southwick, Chase Southwick and Angelique Titus.

23   Dated: November 16, 2012              MORGAN, LEWIS & BOCKIUS LLP

24                                         By    /s/ Collie F. James, IV
25                                             Collie F. James, IV
                                               Attorneys for Defendants
26                                             PNEUMO ABEX CORPORATION (nka
                                               Pneumo Abex LLC) and WHITMAN
27                                             CORPORATION (nka Pepsi-Cola
                                               Metropolitan Bottling Company, Inc.)

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 23655309.5

CASE NO. C-99-3941 SI
DEFTS' MOTION TO EXCLUDE AND
MOTION FOR SUMMARY JUDGMENT